RADER, Circuit Judge,
dissenting.
This case shows the consequences of paying only lip service to the often-cited, but rarely-followed lexicographer rule and the basic jurisprudential principle of according trial courts proper deference.
Elect the Lexicographer Option at Your Own Risk
With this court’s claim constructions wavering between the plain meaning rule (often a subtle way for judges to impose their own semantic subjectivity on claim terms, see, e.g., K-2 v. Salomon, 191 F.3d 1356 (Fed.Cir.1999) (“permanent” affixation of the wheels to the skate boot in the context of in-line skates did not include a bolt that could only be reached by tearing apart the shoe)) and the “specification fiber alies” rule (often a way for judges to import limitations not included in the claim, see, e.g., Phillips v. AWH Corp., 363 F.3d 1207, *1378 1213-14 (Fed.Cir.2004), vacated, reh’g en banc granted, 376 F.3d 1382 (Fed.Cir. July 21, 2004)), a patent applicant might suppose that the best option to define the scope of the claim language might be the lexicographer rule. Under the lexicographer rule, an inventor acts as an independent lexicographer and can even give claim terms a meaning “inconsistent with its ordinary meaning.” Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1347 (Fed.Cir.2003) (citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325-26 (Fed.Cir.2002)); see also Teleflex, 299 F.3d at 1325 (“[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention ‘with reasonable clarity, deliberateness, and precision.’ ” (quoting In re Paulsen, 30 F.3d 1475, 1480 (Fed.Cir.1994))). Indeed, this court often acknowledges that an applicant, acting as a lexicographer, may define “black” as “white.” See Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1563 (Fed.Cir.1990) (“It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings.”); see also, e.g., Int’l Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1373 (Fed.Cir.2004) (paten-tee defining “annular,” which ordinarily means in the shape of a ring, to describe structures that are not circular or curved, but polygonal). In this case, the patentee used the lexicographer rule to define a lengthy phrase. In its definition, the pat-entee defined the phrase with precise values. The patentee’s definition, however, fell five letters short of success because the phrase included the word “about.” This court seized on that word, gave it an ordinary meaning, and cast aside the lexicographer rule without a convincing explanation. Moreover, this court overturned the result of a lengthy district court trial for the sole reason that the trial court applied this court’s lexicographer rule. I find it hard to explain to the district court how it erred by following this court’s rules.
The disputed term in claim 23 of the ’329 patent is the phrase “about 70 mg of alen-dronate monosodium trihydrate, on an al-endronic acid basis.” Similarly, the disputed term in claim 37 is the phrase “about 35 mg of alendronate monosodium trihydrate, on an alendronic acid basis.” Teva contends that this court should parse out one word in that phrase, “about,” and accord that single word its ordinary meaning of “approximately.” Merck, on the other hand, contends that the term “about” is inseparable from the entire phrase, which it defines under the lexicographer rule to account for the variability in the active ingredient weight that would result from the use of a salt of alendronic acid.
The specification shows the proper interpretation of the disputed phrase. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996) (“The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.”). In the specification of the ’329 patent, the patentee exercised the lexicographer option and defined the disputed phrase as follows:
Because of the mixed nomenclature currently in use by those o[f] ordinary skill in the art, reference to a specific weight or percentage of a bisphosphonate compound in the present invention is on an acid active weight basis, unless otherwise indicated herein. For example, the phrase “about 70 mg of a bone resorption inhibiting bisphosphonate selected from the group consisting of alendro-nate, pharmaceutically acceptable salts thereof, and mixtures thereof, on an al-endronic acid active weight basis” means that the amount of the bisphosphonate *1379 compound selected is calculated based on 70 mg of alendronic acid.
’329 patent, col. 10,1. 65 — col. 11,1. 8.
In a passage that classically invokes this court’s lexicographer doctrine, the paten-tee clearly, deliberately, and precisely defined the phrase “about 70 mg of a bone resorption inhibiting bisphosphonate selected from the group consisting of alen-dronate, pharmaceutically acceptable salts thereof, and mixtures thereof, on an alen-dronic acid active weight basis.” The pat-entee set forth that entire term with quotations, including the word “about” and then stated unambiguously that the “phrase ... means that the amount of the bisphosphonate compound selected is calculated based on 70 mg of alendronic acid.” ’329 patent, col. 11,11. 2 — 8 (emphases added). The choice of the words “phrase” and “means,” combined with the use of quotation marks to set the phrase off from the rest of the sentence, unmistakably notify a reader of the patent that the patentee exercised the option to define the entire phrase without respect to its ordinary meaning as understood by one of ordinary skill in the art at the time of the invention. See Multiform Desiccants, Inc. v. Medzam Ltd., 133 F.3d 1473, 1477 (Fed.Cir.1998).
To underscore the choice to define the phrase as a lexicographer, the patentee explains the reason that this phrase needs definition — “[b]ecause of the mixed nomenclature currently in use by those o[f] ordinary skill in the art.” ’329 patent, col. 10,11. 65-66. Therefore, even a casual reader, let alone one with skill in this art, would immediately recognize that the patentee intended to avoid any ambiguity inherent in “mixed nomenclature” by explicitly defining the entire phrase. See Paulsen, 30 F.3d at 1480 (“ ‘Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure’ so as to give one of ordinary skill in the art notice of the change.” (quoting Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1388 (Fed.Cir.1992))).
The language of this definition explains further the scientific reason that an express definition is necessary. Alendronate monosodium trihydrate is a bisphospho-nate selected from the group consisting of alendronic acid, pharmaceutically acceptable salts thereof, and mixtures thereof. A salt or a mixture may require a different weight to achieve the same number of bisphosphonate molecules present in 70 mg of alendronate.
The patentee did not leave this difference vague, however, but instructed that the precise dose in claim 23 — “about 70 mg of alendronate monosodium trihydrate, on an alendronic acid basis” — means that the amount of alendronate monosodium trihydrate is calculated based on 70 mg of alendronic acid. Similarly, the disputed language of claim 37 — “about 35 mg of al-endronate monosodium trihydrate, on an alendronic acid basis” — means that the amount of alendronate monosodium trih-ydrate is calculated based on 35 mg of al-endronic acid. The word “about” in the defined phrase takes into account the variability of the weight of the active ingredient that would result from using different salts of alendronic acid in the tablets, instead of the acid itself. In other words, a heavier salt would require more by weight to achieve the same number of alendro-nate molecules. For example, about 70 mg of alendronate sodium, on an alendronic acid active basis, contains the same number of molecules of alendronate as 70 mg of alendronic acid, regardless of the actual weight of the alendronate sodium in the tablet.
With respect to the word “about,” the patentee included that word in the entire *1380 phrase expressly defined in the specification and set off by quotation marks. Therefore, this court cannot, without disturbing the patentee’s express definition of the entire phrase, abstract that term out of its context and supply an ordinary meaning. Thus, by abstracting “about” out of the patentee’s express definition, this court’s opinion defeats the patentee’s choice of words, punctuation, and phraseology and instead extracts a single word from its context in the phrase. Accordingly, the majority rewrites the express definition either by moving the word “about” outside of the quotation marks of the defined phrase or by inserting the word “about” into the definitional portion of the sentence so that it would read “the amount of the bisphosphonate compound is calculated based on about 70 mg of alendronic acid.” If the patentee had chosen either of those two phraseologies, the majority opinion might be correct in its analysis. But because the patentee did not, this court cannot give any principled reason that the district court erred in applying the lexicographer rule. Contrary to this court’s rules, this opinion rewrites the specification and substitutes language not chosen by the patentee. See, e.g., Chef Am., Inc. v. Lamb Weston, Inc., 358 F.3d 1371, 1374 (Fed.Cir.2004) (repeating the well-established rule that “courts may not redraft claims”).
Throughout the patent, the applicant remained faithful to the disputed phrases in claims 23 and 37 consistent with the specified lexicography, thus completely dispelling any notion of ambiguity in the term “about.” In particular, Examples 7 and 8 corroborate the express definition. Example 7 states that “[tjablets containing about 35 mg of alendronate, on an alendronic acid active basis, are prepared using the following weights of ingredients” and lists alendronate monosodium trihydrate requiring a mass of 45.68 mg. See ’329 patent, col. 19,11.14 — 21. Similarly, example 8 states that “[a] liquid formulation containing about 70 mg of alendronate mo-nosodium trihydrate, on an alendronic acid active basis, per about 75 mL of liquid is prepared using the following weights of ingredients” and lists alendronate monoso-dium trihydrate having a mass of 91.35 mg. Id. at col. 19, 11. 44 — 52. In these examples, the applicant supplied an exact weight that equates with “about 70 mg of alendronate ... on an alendronic acid active basis.” Accordingly, the district court did not err in construing “the disputed claim terms ‘about 70/35 mg’ to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carry accessories.” Merck, 288 F.Supp.2d at 616. The district court followed this court’s rules.
Deference to Trial Courts: Time for “Truth in Advertising?”
This is the classic “close case,” so close in fact that ultimately two federal judges (one of whom conducted an entire bench trial on this issue) and the United States Patent and Trademark Office agreed with Merck & Co., and two federal judges agreed with Teva Pharmaceuticals. The United States District Court of Delaware tried this case from March 4 — 7, 2003, then issued a 75-page opinion analyzing the claims and arguments in consummate and accurate detail. Merck & Co. v. Teva Pharms. USA Inc., 288 F.Supp.2d 601 (D.Del.2003). This court received the typical briefs from the parties, an appendix containing selected portions of the record, and heard a total of approximately thirty minutes of argument by the parties on the issues before this court. Despite the district court’s superior tools and time to evaluate the complete record, to hear and inquire from expert and fact witnesses, to delve into countless related details, to probe the scientific and semantic context, and to entertain argument as *1381 long as necessary for clarity, this court with its reading three briefs before its half-hour hearing becomes enamored with its own analysis of a very close issue and reverses the district court.
This court often hears criticism from district court judges that its reversal rate on claim construction issues far exceeds that of other circuit courts. See, e.g., Symposium, The Law, Technology and the Future of the Federal Circuit: A Panel Discussion: Claim Construction from the Perspective of the District Judge, 54 Case W. Res. L.Rev. 671 (2003) (Symposium I) (district judges discussing problems with this court’s high reversal rate on claim construction issues); see Gregory J. Wallace, Note, Toward Certainty and Uniformity in Patent Infringement Cases after Festo and Markman: A Proposal for a Specialized Patent Trial Court unth a Rule of Greater Deference, 77 S. Cal. L.Rev. 1383, 1391 (2004) (discussing various studies regarding this court’s reversal rate on claim construction issues). In response, nearly every judge on this court has publicly professed to accord some level of deference to district courts regardless of this court’s de novo review of claim construction issues. See, e.g., Symposium I at 680 (a district court judge stating “I have certainly heard a number of federal circuit judges agree, that the CAFC gives some deference to a well-reasoned opinion, as a practical matter”); Symposium, The Past, Present and Futu/re of the Federal Circuit: Judicial Constellations: Guiding Principles as Navigational Aids, 54 Case W. Res. L.Rev. 757, 761 (2004) (judge of the Federal Circuit stating: “Review is really not de novo after all. It is unfortunate that there is no label in between de novo and clear error review. Functionally, claim construction falls in this middle ground.”). Either the Federal Circuit accords deference in accordance with its public protestations or it does not in accordance with its legal standard barring any deference. If the former, this court has a “truth in advertising” problem. Its actual practice clashes with its professed legal duty. If the latter, this court has a different kind of “truth in advertising” problem.
In this case, this court eschews all deference, a particularly striking choice in the face of a very close case and a district court whose diligent and intelligent process and resolution earned more respect than it received. I am not entirely sure which aspect of the “truth in advertising” problem this case illustrates, but it certainly makes any protestations of deference in fact sound rather hollow.